**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| SOUTHERN STATES COOPERATIVE, INC. | : | CIVIL ACTION |
| | : | |
| | : | NO. 06-1494 |
| v. | : | |
| | : | |
| GLOBAL AG ASSOCIATES, INC. | : | |

**MEMORANDUM AND ORDER**

**Kauffman, J.**                                                               **March    27, 2008**

Plaintiff Southern States Cooperative, Inc. ("Southern States" or "Plaintiff") brings this

action against Defendant Global AG Associates, Inc. ("Global AG" or "Defendant") alleging

breach of contract and breach of the implied covenant of good faith and fair dealing.  Defendant

has filed counterclaims alleging breach of contract, interference with contractual relations,

defamation, and misrepresentation.  Now before the Court are (1) Plaintiff's Motion for partial

summary judgment on Count I of its Complaint and Count VIII of Defendant's Counterclaim;

and (2) Defendant's Motion for Partial Summary Judgment on Count VIII of its Counterclaim.

For the reasons that follow, Plaintiff's Motion will be granted in part and denied in part, and

Defendant's Motion will be denied.

**I.      BACKGROUND**

The following facts are undisputed.  Beginning in late 2000, the parties entered into a

series of Dealer Agreements.[1]  The Agreements provided that Defendant would become a non-

---

[1]      Southern States manufactures and produces pet food, animal health products, vegetable
and pasture seed, and farm and home supplies.  Global AG is a retailer and distributer of these products.

exclusive local retailer of certain Southern States products and services.[2]  As part of the

Agreements, Defendant was given a non-exclusive sub-license to use the name and registered

trademark of Agway.[3]  Plaintiff alleges that as of February 28, 2006, Defendant owed

$1,127,105.46 for the products that it purchased and received.  In addition, Plaintiff alleges that a

Credit Agreement entered into by the parties in October 2000 entitles it to a finance charge at an

annual rate of 18%, to be applied to delinquent accounts.  Defendant does not deny that it

purchased over $1 million worth of goods from Plaintiff and that it failed to pay in full, but

disputes the amount allegedly owed as well as Plaintiff's entitlement to a finance charge.

In its Motion, Defendant argues that Plaintiff terminated the Dealer Agreements without

good cause or fair notice, in violation of the New Jersey Franchise Practices Act, N.J.S.A. §

56:10-1, et seq. ("NJFPA").  Plaintiff opposes the Motion, arguing that the parties never entered

into a franchise relationship, and as a result, the NJFPA is inapplicable.

## II.    LEGAL STANDARD

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is

"whether there is a genuine issue of material fact and, if not, whether the moving party is entitled

to judgment as a matter of law." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir.

1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).  "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine the evidence in the light most

---

[2]     The Agreements provide for the sale of products in a number of New Jersey locations, including Clinton, Flemington, Washington, and Hightstown, as well as York, Pennsylvania.

[3]     On July 31, 2000, Agway and Southern States entered into a license agreement whereby Southern States was granted the exclusive right to use the name and registered trademark of Agway.

favorable to the non-moving party and resolve all reasonable inferences in that party's favor.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "there

can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete

failure of proof concerning an essential element of [its] case necessarily renders all other facts

immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III.   DISCUSSION

### A.   Count I

The Dealer Agreements provide for contract interpretation pursuant to Virginia law.  The

essential elements of a cause of action for breach of contract under Virginia law are: (1) a legal

obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a

consequential injury or damage to the plaintiff.  Albanese v. WCI Communities, Inc., 2007 WL

4751320, at *6 (E.D. Va. Dec. 7, 2007), citing Westminster Investing Corp. v. Lamps Unlimited,

Inc., 237 Va. 543, 545 (Va. 1989).

In Count I of its Complaint, Plaintiff alleges that it delivered $1,127,105.46 worth of

products to Defendant, but never received payment.  Defendant does not deny that it has an

outstanding balance, but disputes the accuracy of the sums demanded by Plaintiff, citing "billing

problems" and "improper payment practices."  Defendant alleges that: (1) the parties orally

modified the payment terms on certain invoices, revising the billing schedule without any

reference to finance charges; (2) Plaintiff has no valid contract authorizing it to charge Defendant

18% on delinquent balances; (3) Plaintiff refused to credit Defendant for payments it made; and

(4) the invoices submitted by Plaintiff contain numerous clerical errors that raise genuine issues

of material fact as to the total amount owed by Defendant.

Plaintiff disputes Defendant's representations and reasserts the accuracy of its invoices. In

support of the argument that it was authorized to charge an 18% finance charge, Plaintiff attaches

an Application for Wholesale Credit, which was signed by Defendant in October 2000.  See Ex.

G to Plaintiff's Brief in Support of Motion for Summary Judgment.  Plaintiff also states that for

years, Defendant knew that Plaintiff assessed an 18% finance charge on delinquent accounts, and

paid these finance charges without objection.  See Declaration of Anne Clingenpeel, attached as

Ex. A to Plaintiff's Reply Brief, at ¶ 8.

Defendant's arguments regarding subsequent oral modification of payment terms do not

pertain to the question of liability, but may affect the measure of damages to which Plaintiff is

entitled.  Plaintiff contends that an oral modification of the contract is unenforceable, citing to

the integration clause in the Dealer Agreements:

> This Agreement supercedes all prior agreements and discussions between the parties regarding the subject matter and *may be modified only by a writing signed by both parties*.  No waiver, amendment, release, or *modification* of this Agreement shall be established by conduct, custom, or course of dealing, but *solely by a written document executed by both parties*.

Dealer Agreements, ¶ 14.1 (emphasis added).  "Under Virginia law, written agreements can be

modified by subsequent oral agreement if the express mutual assent of both parties is

demonstrated."  Jackson Hewitt, Inc. v. Greene, 865 F. Supp. 1199, 1202 (E.D. Va. 1994), citing

Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 72 (Va. 1983).  "Mutual assent must be

proven with "clear and unmistakable proof."  Id.  Defendant has submitted evidence of ongoing

negotiation of payment terms between the parties.  For instance, Rose Harper, former credit

analyst at Southern States, testified that payment schedules were frequently altered:

> Q: Starting back in the year 2000 describe for me how the payment situation and the credit situation with Global AG evolved.
>
> [...]
>
> A: Originally when it was set up they had a prepayment account that they put the money in ... At times the account would get past due.  He didn't have enough

4

money in the prepay account to pay the total balance due on the account. [...] I contacted at that time Brian Seiberling ... He and I worked out trying to work out payment schedules, but that was – he would tell me or I would tell him how much he needed to send in for the month to try to get caught up and he would come back and let me know if he could spend that or could not spend that. [...] The payment arrangements we would usually work out most of the time it was on a monthly basis, but then there were other times during the month I would talk to him sometimes they would have to change their payment schedule around [...] I'd advise Ann [Clingenpeel] of the change in the schedule.

See Deposition of Rose Harper, May 10, 2007, at 22-26.  Defendant further alleges that Plaintiff failed to credit its account for products it returned, that it is entitled to a credit for sums paid directly to certain vendors after Plaintiff terminated the Agreements, and that Plaintiff included among its exhibits invoices that were issued to third parties.  Plaintiff disputes Defendant's eligibility for these credits.  Based on the record before the Court, genuine issues of material fact preclude summary adjudication of damages.  Accordingly, Plaintiff's Motion as to Count I of the Complaint will be denied.

### B.      Count VIII

"The [NJFPA] protects franchisees against indiscriminate termination by providing that it shall be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise without good cause."  Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc., 63 F.3d 262, 268 (3d Cir. 1995) (citing N.J.S.A. § 56:10-5).  In Count VIII of its Counterclaim, Defendant alleges that it was a franchisee of Plaintiff, and that by terminating the Dealer Agreements without proper notice or good cause, Plaintiff violated provisions of the NJFPA.  As a threshold matter, the Court must determine whether, in light of the fact that the parties have chosen Virginia law to govern, the NJFPA applies to this dispute.  In addition, because the NJFPA applies solely to franchise relationships, the Court must examine the agreements and course of conduct between the parties to determine whether their relationship constitutes a "franchise" within the meaning of

the NJFPA.  See Cassidy Podell Lynch, Inc. v. Syndergeneral Corp., 944 F.2d 1131, 1137-38 (3d

Cir. 1991) (applying New Jersey law).

As the Supreme Court of New Jersey observed in Instructional Sys., Inc. v. Computer

Curriculum Corp., 614 A.2d 124, 133 (N.J. 1992), the existence of a choice of law clause

designating the law of a state other than New Jersey as governing the contract does not in itself

preclude application of the NJFPA.  The Court reasoned that in cases where it maintains

significant "contacts" with a transaction, "New Jersey has a strong policy in favor of protecting

its franchisees."  Id. at 135; Cooper, 63 F.2d at 268-29 (applying NJFPA notwithstanding choice

of law clause designating Iowa law as governing interpretation); Wright-Moore Corp. v. Ricoh

Corp., 908, F.2d 128, 132 (7th Cir. 1990) ("[A] franchisor, through its superior bargaining power,

should not be permitted to force the franchisee to waive the legislatively provided protections,

whether directly through waiver provisions or indirectly, through choice of law.").

In this case, New Jersey maintains significant contacts with the dispute.  Four of the

Dealer Agreements required Defendant to maintain store locations in New Jersey.  Defendant

made direct sales to the public in New Jersey, and the vast majority of its employees reside in

New Jersey.  See Defendant's Motion for Summary Judgment, at 54.  Accordingly, the choice of

law provision in the Dealer Agreements will not preclude application of the NJFPA should the

Court determine that a franchise relationship existed between the parties.

The question of whether the business relationship between the parties constituted a

franchise presents a "mixed question of fact and law."  Cassidy, 944 F.2d at 1137.  It entails an

examination of both the language of the Dealer Agreements, and of the parties' practices and

course of conduct.  Id. at 1138.  To determine if a franchise existed, the Court must engage in a

three-part inquiry: (1) was there a "community of interest" between the franchisor and the

franchisee; (2) did the franchisor grant a "license" to the franchisee; and (3) did the parties contemplate that the franchisee would maintain a "place of business" in New Jersey.[4]  Cooper, 63 F.3d at 268-69, citing N.J.S.A. § 56:10-3.[5]

### 1. Community of Interest

"[A] community of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skills that will be of minimal utility outside the franchise."  Cooper, 63 F.3d at 269 (citing Cassidy, 944 F.2d at 1143).  In order for a community of interest to exist, a two-part test must be met: (1) the distributor must have made substantial "franchise-specific" investments, and (2) the distributor must have been *required* to make these investments by the parties' agreement or the nature of the business.   Id. at 269 (emphasis added); see also Cassidy, 944 F.2d at 1140.  "[A] community of interest means more than the mere fact that two parties share in the profits realized when a product makes its way from manufacturer to the ultimate consumer."  Colt Indus. Inc. v. Fidelco Pump & Compressor Corp., 844 F.2d 117, 120 (3d Cir. 1988).  Economic dependence on a single supplier is not dispositive of the question.  See Cassidy, 944 F.2d at 1142 ("[W]e do not think reliance on a single supplier automatically qualifies a distributor for protection under the [NJFPA].  If it did, all exclusive distributors could unilaterally decide to convert their distributorships into franchises without regard to the shared intent of the parties in entering in the distributorship agreement.").

---

[4]      There is no dispute that the Dealer Agreements contemplated a "place of business" in New Jersey.  Accordingly, the Court will limit its review to the first two prongs of the franchise test.

[5]      "From a legal standpoint, the distinctions between franchises and distributorships are frequently blurred." 1 Franch & Distr Law & Prac § 1:2 (2007).  "Franchising takes the notion of extending reciprocal and complementary obligations between the seller and buyer ... a franchisee is an independent business that acts as a manufacturer's or franchisor's licensee, and in a practical sense, as its representative."  Id.

In support of its argument that it satisfies the community of interest prong of the franchise test, Defendant alleges that it made substantial franchise-specific investments, allowing Plaintiff significant involvement in its "customer base," and spending the majority of its advertising budget promoting and marketing Plaintiff's products.  See Defendant's Motion for Partial Summary Judgment, at 77-78.  Defendant further alleges that it became increasingly dependent on Plaintiff for its supply of goods, and when Plaintiff terminated the Dealer Agreements, the loss of access to animal feed products "devastated" a segment of its business, causing many customers to terminate their relationship with Defendant.  Id. at 79-81.

Plaintiff asserts that the parties never contemplated entry into a franchise agreement, as evidenced by the express language of the Dealer Agreements:

> It is understood and agreed by Southern States and Dealer that Dealer, Dealer's agents and employees shall be acting as an independent contractor and nothing in this Agreement shall at any time be construed to create the relationship of employer and employee, partner, principal and agent, *franchisor and franchisee*, or joint venturers as between Southern States and Dealer.

See Dealer Agreements § 1.1 (emphasis added).[6]  Plaintiff did not exercise the type of control over Defendant that would give rise to a franchise relationship: it never imposed a requirement that a minimum percentage of Defendant's products be purchased from Plaintiff, and as Defendant's Chief Executive Officer Scott Raubenstine testified, Defendant was a *non-exclusive* retailer of certain Southern States products, and was at all times free to, and did in fact sell goods from companies competitive with Southern States.  See Deposition of Scott Raubenstine ("Raubenstine Dep."), May 8, 2007, at 17.  See also Colt, 844 F.2d at 120-21 (declining to find a community of interest in the absence of evidence that distributor was "subject to the whim, direction and control of a more powerful entity whose withdrawal from the relationship would

---

[6]      The Dealer Agreements contained an integration clause.  See Section I(A), *supra*.

shock a court's sense of equity."). Moreover, Defendant's participation in Plaintiff's advertising program was entirely optional, and there was no requirement that Defendant spend any particular amount of money on advertising. See Declaration of Ron Sutton ("Sutton Decl."), attached as Ex. A to Plaintiff's Memo in Opposition, § 8; Raubenstine Dep. at 30-31; Colt, 844 F.2d at 120 ("The sales meetings held at Fidelco's locations and the advertising and promotional materials, for example, demonstrated no more than cooperation in selling compressors. These sales meetings were not mandatory training ... nor was there a Colt-mandated method for selling the product ... the advertising and promotional materials provided to Fidelco by Colt were only suggested, not required.").

Other than the fact that it *chose* to purchase large volumes of Plaintiff's products, the record is devoid of evidence that Global AG made substantial "franchise-specific" investments that would be of no value outside the franchise relationship. See Cassidy, 944 F.2d at 1144 ("Although [the defendant's] products were a substantial part of [the plaintiff's] sales, [the plaintiff's] reliance on [the defendant] as a supplier was self-imposed."). As Raubenstine acknowledged, Defendant was not required to invest in special equipment or signage, nor did the sale of Southern States products require it to develop special knowledge that would be non-transferrable. The products Defendant sold were "off the shelf" goods that did not require specialized skill or training. See Sutton Decl., at ¶ 9. The knowledge of agricultural goods that Defendant may have gained would not be rendered useless upon the termination of the Dealer Agreements. See Cassidy, 944 F.2d at 1144 ("[T]he knowledge and customer base that [the plaintiff] acquired during its relationship with [the defendant] is not franchise-specific. It is transferable."); see also Instructional Sys., 614 A.2d at 141 (observing that "franchise-specific" investments are typically "tangible capital investments, such as a building designed to meet the

style of the franchise, special equipment useful only to produce the franchise product, and franchise signs.  For example, McDonald's franchisees were required for many years to purchase and install 'Golden Arches' which were of little value if the franchise were lost.").

These facts stand in sharp contrast to the operative facts in Instructional Systems, a case heavily relied upon by Defendant, in which the Court determined that the parties' business relationship amounted to a franchise subject to the protection of the NJFPA.  In so concluding, the Court reasoned that the franchisee, ISI, made significant franchise-specific tangible investments: "For example, the Microhosts that ISI purchased from CCC for demonstrating CCC's software and courseware involved an investment of approximately $100,000.  In the event of a termination, ISI would not be able to resell the Microhosts because it would be prohibited from licensing the CCC software and courseware ..." Instructional Sys., 614 A.2d at 144.  The Court referred to a number of "sunk investments," products and expertise that would have no use outside the franchise relationship: "at least $250,000 for the purchase of Microhosts and Microhost upgrades; at least $30,000 for the purchase of CCC hardware ... the purchase of numerous CCC computer terminals ... the cost to ISI of conducting studies for many school districts with respect to the use of CCC products." Id.  The Court also noted the significant interdependence between the parties and the ongoing control exercised by the franchisor over the direction of the franchisee's business: "CCC controlled ISI's business by obligating ISI to direct all of its energies and resources to developing a demand for the CCC products and by prohibiting ISI from developing or designing any products that might compete with CCC products in any location.  Therefore, ISI was unlike a department store that could sell both Sony and Zenith televisions or market both Apple and IBM computers." Id. at 145.

Similarly, in Cooper Distributing, another case relied upon by Defendant, the Court found

that the parties had formed a franchise relationship within the meaning of the NJFPA only after

concluding, *inter alia*, that the franchisee had made significant franchise-specific investments,

and that these investments created franchise-specific goodwill: "Here, Cooper introduced

evidence that its employees invested much time over the years in acquiring knowledge about

Amana products and that this knowledge was not transferable outside the Amana-franchise

context."  Cooper, 63 F.3d at 270.  These investments consisted of the operation of a

showroom/marketing center, use of the facility for Amana product demonstrations, dealer

training in Amana products, dealer open houses, and training in the Amana product line.  Id. at

267.  The Court observed that until the franchisor began selling products to national and local

retailers, "Cooper had been the exclusive distributor in its region for nearly 30 years."  Id. at 267.

The factors that led the Cooper Court to conclude that a community of interest existed are not

present in the case at bar.  In the absence of evidence that Defendant made substantial franchise-

specific investments or was required to do so, a reasonable fact finder could not conclude that a

community of interest existed between the parties.

**2. Grant of License**

The next prong of the franchise test requires Defendant to show that it was granted a

"license" by Plaintiff.  See Instructional Sys., 614 A.2d at 138 ("Before a party may be deemed a

franchisee subject to the [NJFPA's] protections, it must show that it had been granted a license to

use a trade name, trade mark, service mark, or related characteristic." (citing N.J.S.A. § 56:10-

3a)).  Defendant argues that Plaintiff granted it a license to use the Agway trademark in

satisfaction of the second prong of the franchise test.  The Court disagrees.

The term "license" in the context of the NJFPA has been narrowly-defined, and "does not

encompass a definition of license in the word's broadest sense, that is: permission to do

something that without the license would not be allowable." Cooper, 63 F.3d at 272 (citations

omitted).  Rather, to qualify as a licensee, the alleged franchisee "must use the name of the

franchisor in such a manner as to create a reasonable belief on the part of the consuming public

that there is a connection between the licensor and licensee by which the licensor vouches, as it

were, for the activity of the licensee." Instructional Sys., 614 A.2d at 139 (citations omitted);

Liberty Sales Assoc., Inc. v. Dow Corning Corp., 816 F. Supp. 1004, 1010 (D.N.J. 1993) ("The

license contemplated by the Act is one in which the franchisee wraps himself with the trade name

of the franchisor and relies on the franchisor's goodwill to induce the public to buy ... [w]hat

distinguishes a franchise from an ordinary distributorship is that the goodwill inherent in the

name and mark attaches to the entire business of the seller, not just to the goods themselves.").[7]

As Defendant acknowledges, it did not use the Southern States or Agway names as its

own, and has always operated under its own trade name, requiring its employees to wear

uniforms bearing the Global AG logo.  See Raubenstine Dep. at 56-57.  Moreover, the Dealer

---

[7]	The Dealer Agreements contains provisions pertaining to Defendant's use of Plaintiff's trademark.  These provisions states, in relevant part:

10.1	Pursuant to a License Agreement dated July 31, 2000 between Agway, Inc. ("Agway") and Southern States, (the License Agreement"), Southern States has the non-exclusive right, for the term of the License Agreement, to use the name "AGWAY" and the registered trademark ... Southern States hereby grants to Dealer a non-exclusive sub-license to use the name "AGWAY" and the Agway Marks, for purposes permitted under, and in accordance with and subject to the terms and conditions of the License Agreement.

10.2	Dealer shall use the Agway Marks only in conjunction with:
(i) The offer and sale of Agway Products;
(ii) Point of sale material to identify to the public that Agway Products offered for sale are products of Agway;
(iii) A sign approved by Agway, that Dealer offers Agway Products for sale at Dealer's location; and/or
(iv) Advertising, subject to the terms of Section 10.4 below.

Dealer Agreements § 10 ("Trademarks").

Agreements required Defendant to use its best efforts to promote the retail service and
distribution of certain Southern States and Agway *products*, not their name, trademark, or logo.
See Liberty Sales Assoc., 816 F. Supp. at 1011 ("[I]t is the obligation of the franchisee to
promote *the mark itself*, as distinct from merely using it to make sales, which distinguishes a
license meeting the [NJFPA's] requirements from the right to use a mark that any reseller of
goods gets when purchasing those goods from the owner of the mark." (emphasis added)).
Finally, as discussed above, while Plaintiff provided Defendant with sample advertising materials
for its optional use, it never required it to participate in advertising campaigns.  See id. at 34.
Such arrangements have been held insufficient to satisfy the license prong of the franchise test.
See Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div., 362 A.2d
595 (N.J. App. 1983) ("Mere furnishing of advertising materials as contemplated by the
distributorship agreement, and allowing plaintiff to have its name placed on certain items, if it
wished ... does not fulfill the letter or intent of the Franchise Practices Act.  Obviously, someone
who sells a product has to, or wants to, make known that he has it."); see also Colt, 844 F.2d at
120 ("[I]f this limited agreement constitutes a license to use a trademark, then any business
selling a name brand product would, under New Jersey law, necessarily be considered as holding
a license."); Liberty Sales Assoc., 816 F. Supp. at 1011 ("A manufacturer of branded goods will
certainly not object, and may encourage, a distributor to use its name or mark to encourage sales.
This kind of use does not turn a distributor or seller of goods into a licensee for purposes [of] the
Act.").

In Instructional Systems, the New Jersey Supreme Court held that sufficient evidence
existed in the record to find that a license had been granted.  In so concluding, the Court
observed that the parties had "established a relationship ... that is quite different from that of a

department store that sells Apple or IBM computers." Instructional Sys., 614 A.2d at 139. The Court further noted that the product at issue was "not an 'off-the-shelf' product that can be purchased at the neighborhood appliance store," and that the parties' agreement prohibited the franchisee from "developing or designing any products that might compete" with the franchisor. Id. The facts deemed by the New Jersey Supreme Court as critical to its determination that a license had been granted are entirely absent from the case at bar: (1) the Southern States products sold by Defendant were "off-the-shelf" products that did not require specialized training; and (2) Defendant was a non-exclusive retailer of Southern States products that was, at all times, permitted to, and in fact did sell products competitive with Southern States products. Indeed, after Southern States terminated the relationship, Defendant continued to operate its business under its own name.[8]  See Liberty Sales Assoc., 816 F. Supp. at 1011.   Accordingly, the Court concludes that Plaintiff did not grant Defendant a "license" within the meaning of the NJFPA. Because Defendant satisfies neither the first nor the second prong of the franchise test, summary judgment will be granted in Plaintiff's favor as to Count VIII of the Counterclaim.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion will be denied as to Count I of the Complaint, and granted as to Count VIII of Defendant's Counterclaim. Defendant's Motion will be denied. An appropriate Order follows.

---

[8]        Because Southern States does not own the rights to the Agway trademark with respect to animal feed products, Defendant continued to sell that product under the Agway name. See Raubenstine Dep. at 20.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SOUTHERN STATES COOPERATIVE, INC. | : | CIVIL ACTION |
|  | : |  |
|  | : | NO. 06-1494 |
| v. | : |  |
|  | : |  |
| GLOBAL AG ASSOCIATES, INC. | : |  |

### ORDER

**AND NOW,** this     27th     day of March, 2008, upon consideration of Plaintiff's Motion for Partial Summary Judgment on Count I of its Complaint and Count VIII of Defendant's Counterclaim (docket no. 34) and Defendant's Motion for Summary Judgment on Count VIII of its Counterclaim (docket no. 33), and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that Plaintiff's Motion is **DENIED** as to Count I and **GRANTED** as to Count VIII.  It is **FURTHER ORDERED** that Defendant's Motion is **DENIED**.

BY THE COURT:

/s/ Bruce W. Kauffman
BRUCE W. KAUFFMAN,  J.

15